Larry WELLS, Appellant,

v.

STATE of Indiana, Appellee.

No. 282S63.

Supreme Court of Indiana.

Nov. 12, 1982.

Rehearing Denied Feb. 1, 1983.

William C. Moyer, New Albany, Kenneth L. Sales, Frank E. Haddad, Jr., Louisville, Ky., for appellant.

Linley E. Pearson, Atty. Gen., LatrEalle Wheat Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Chief Justice.

Appellant was charged with two counts of Murder. He was tried by a jury and was found guilty on both counts. He was sentenced to concurrent terms of imprisonment of forty (40) years.

The victims of the crime were appellant's wife Alice and a man whom she had been dating, one Bill Hollan. The marital relationship between appellant and his wife had been deteriorating for a couple of years. Each had begun dating other individuals. About a month prior to the commission of the crime, Alice had moved to Austin, Indiana, to live with her sister, Lennie Begley, and Lennie's two sons. Appellant continued to live at the couple's house in Clarksville.

On the morning of April 24, 1980, appellant called Alice at Lennie Begley's apartment to ask her to come to Clarksville to sign their state income tax refund check so he could cash it. Alice drove to Clarksville with Lennie's two sons in an automobile she shared with the couple's daughter Kelly. Upon arrival she signed the check. Appellant informed her he intended to keep the automobile and their dog when they dissolved the marriage. Alice protested but to no avail. Appellant drove her and the two boys back to Austin in his car. Sometime in the early afternoon he left the apartment. At about 4:00 p.m. Bill Hollan came by and picked up Alice in his pickup truck.

Appellant began calling the apartment early that evening wanting to speak to Alice. He told Lennie he had changed his mind about letting Alice have the automobile and the dog and wanted to so inform her. At about 9:00 p.m. he arrived at the apartment but was told his wife was not there. He left for a few minutes, returned to the apartment for a very short time, and left again about 9:20.

Just a few minutes later, Lennie's thirteen year old son, Larry Hollan, heard Bill Hollan's truck approaching. He testified he was able to identify it by sound because it had no muffler. He went to the front door and observed Hollan's truck going rather fast by the apartment with appellant's car

following only five or six feet behind. He stated he could not see who was driving the car. He also stated he was certain the car he saw was appellant's car, which was a 1973 black over red Dodge Polara. He stated he was quite familiar with the car and no other car like it was ever seen around Austin.

At about 9:35 p.m., two Austin police officers were dispatched to the corner of North Street and Third Street, which was three blocks from Lennie Begley's apartment. There they found Bill Hollan and Alice Wells in the truck with its engine running and the lights on. Each of them had a single gunshot wound in the left temporal area of the head. They were alive when found but both died shortly thereafter. Testimony from neighbors who heard two shots fired and from the two officers fixed the time of death as between 9:30 and 9:35 p.m.

Through other testimony appellant was placed in Greenwood, Indiana, approximately seventy-five miles from Austin at about 10:30 p.m.

Evidence was also presented showing appellant was aware his wife was seeing Bill Hollan, though it was not shown he knew Hollan on sight nor that he knew what kind of vehicle Hollan drove. Evidence was introduced showing appellant had been physically abusive to his wife on at least one occasion in the past. Evidence was also introduced showing he held feelings of bitterness toward his wife because of her relationship with Bill Hollan.

Appellant claims the evidence is insufficient to support the verdict of the jury. He particularly emphasizes the fact the evidence is all circumstantial and maintains the evidence here no more than establishes a suspicion that he committed the crime. He also lays heavy emphasis on certain exculpatory evidence; such as, no murder weapon was ever produced.

The State introduced evidence appellant was given a Smith and Wesson .38 caliber revolver by his girlfriend late in October of 1979. However, a business associate of appellant, one Howard Etherton, testified appellant gave him that weapon on November 1 or 2, 1979, and that the weapon was stolen from his car sometime later that month. Etherton testified he bought a Charter Arms .38 caliber revolver from a friend in December of 1979 and gave it to appellant to replace the stolen pistol. This weapon was introduced by appellant as part of his defense. His daughter Kelly identified it as the weapon she saw in her father's home in March, 1980, and also identified it as the weapon she saw in the glove box of his car on the morning of the murders. Howard Etherton testified he removed the Charter Arms weapon from appellant's car after he was arrested and shortly before trial he turned it over to the police. A ballistics expert conducted tests on the bullet removed from Bill Hollan's head and bullets fired from the Charter Arms .38. He testified the Charter Arms could not have been the murder weapon as bullets fired from it had eight lands and grooves while the bullet that killed Hollan had but five. Appellant's girlfriend viewed the Charter Arms .38 and said it looked much like the Smith and Wesson she had given him.

A witness living near the spot where the truck was found testified she heard two shots fired at about 9:30 p.m. that night. She testified she immediately looked out her window in time to see a black over red automobile speeding down the street. On four occasions she viewed a photographic display made up of nine photographs of black over red cars, including three photographs of appellant's car. On all four occasions she identified another car, a 1975 Chevrolet Impala, as the car she saw going down the street. She also admitted she felt she had no expertise with regard to automobile identification.

Appellant also points out evidence was introduced showing he would have had to drive at speeds in excess of eighty-five miles an hour to have reached Greenwood by 10:30 p.m. if indeed he was still in Austin at 9:30 p.m. A Greenwood police officer who knew appellant was the witness who placed him in Greenwood at near 10:30.

The test we use in sufficiency of evidence questions has been stated many times by this Court. On appeal we do not reweigh the evidence nor judge the credibility of witnesses. *Doty v. State,* (1981) Ind., 422 N.E.2d 653. Where the evidence is all circumstantial we do not have to find the evidence is adequate to overcome every reasonable hypothesis of innocence but merely that an inference may reasonably be drawn therefrom which supports the finding of the jury. *Raspberry v. State,* (1981) Ind., 417 N.E.2d 913; *Eaton v. State,* (1980) Ind., 408 N.E.2d 1281; *Jones v. State,* (1978) 268 Ind. 640, 377 N.E.2d 1349.

In the case at bar we find the test as stated above is met. The key testimony in the State's case was that of Larry Hollan, who stated he was certain he saw appellant's car following Bill Hollan's truck minutes before the murders occurred. Though he was not able to identify the driver of the car, it was reasonable for the jury to infer appellant was driving his own car, thus placing appellant three blocks from the murder site just minutes before the murders occurred. Combined with the evidence of appellant's feelings of bitterness about his wife's relationship with Bill Hollan, evidence he had a gun in the car that morning, and evidence a car very much like his was seen driving away from the scene immediately after the crime, it was reasonable for the jury to conclude beyond a reasonable doubt appellant committed the offense.

Appellant's argument on this issue amounts to an invitation for us to reweigh the evidence and dismiss certain witnesses' testimony, particularly that of Larry Hollan, as not being credible. This we will not do. *Doty, supra.* We do not find the testimony of Larry Hollan so inherently unbelievable as to make him credibly suspect and thus permit us to disregard it. *See, Penn v. State,* (1957) 237 Ind. 374, 146 N.E.2d 240. The evidence, although circumstantial, is sufficient to support the verdict of the jury.

Appellant claims the trial court erred in admitting evidence of a shooting incident at International Harvester Company plant in Louisville. This shooting occurred on or near December 11, 1979. Appellant worked at the plant and was president of one of the unions there which struck the plant in early November, 1979. On December 11, Harvester officials discovered someone had fired at least two shots into a building on the grounds of the plant. One of the bullets was recovered. The ballistics expert who testified in the trial examined the bullet. He testified it was fired from the same weapon as was the bullet taken from Bill Hollan's head. A Harvester security officer testified he received anonymous tips appellant was involved in the shooting. He also testified upon further investigation it was determined this tip was not reliable and appellant was never even a suspect in the shooting.

Appellant objects to the admission of any testimony regarding this incident on the grounds it was irrelevant as to the determination of his guilt. Such evidence is admissible if it tends to prove intent, motive, purpose, identity, common scheme or plan, or depraved sexual instinct, especially if the two crimes are related. *Howell v. State,* (1980) Ind., 413 N.E.2d 225; *Porter v. State,* (1979) Ind., 397 N.E.2d 269; *Woodard v. State,* (1977) 267 Ind. 19, 366 N.E.2d 1160. Appellant claims the evidence of the other crime should have been excluded because an additional requirement in applying the exception is the defendant must be identified with some degree of certainty as the person who committed the other crime. Appellant claims this burden is not met here, as there was no evidence he was ever found guilty of any offense in connection with the incident nor was he ever considered a suspect. Moreover, he points out there was evidence introduced that there were over 4,000 employees at the Harvester plant and most of them were on strike at the time of the shooting. Thus he concludes the evidence identifying him as the perpetrator of the other offense was so slight that all evidence of the prior crime should have been excluded.

The State's response is the evidence of the prior shooting particularly the hearsay

report that he was involved in the incident serves to identify him as the perpetrator of the instant offense. Further, the State asserts the evidence that he was involved in the Harvester shooting is sufficient to allow admission of testimony about the event. The State cites *Lund v. State,* (1934) 207 Ind. 347, 190 N.E. 850, in support of its argument. There this Court held where the exception allowing admission of evidence of prior criminal activities is invoked, the evidence the defendant committed the prior crime need not show guilt beyond a reasonable doubt.

█ We are disposed to agree with appellant on this point. In *Howell, supra,* 413 N.E.2d at 226 we acknowledged the validity of the exception but added: "[I]t goes without saying that there must be evidence of probative value showing that the defendant actually engaged in those acts." Though the State is correct in asserting the evidence of the prior crimes need not show guilt beyond a reasonable doubt, in the case at bar, the evidence linking appellant with the Harvester shooting fails to have any probative value whatsoever. Thus, it was error to admit that evidence at all.

█ We are then left with the question of whether appellant was harmed by the erroneous admission of this evidence. Considering especially the evidence appellant was conclusively regarded by Harvester officials as not being a suspect in the Harvester shooting, the evidence as a whole directed the inference of guilt away from appellant rather than toward him. Thus, we fail to see how appellant was prejudiced by the admission of the evidence. Errors not shown to have prejudiced a party's substantial rights do not require reversal. *Duncan v. State,* (1980) Ind., 412 N.E.2d 770; *Estep v. State,* (1979) Ind., 394 N.E.2d 111. We hold though it was error to admit the evidence of the shooting incident at the Harvester plant, it was harmless error and does not require a reversal.

Appellant claims the trial court erred in allowing certain allegedly inflammatory and prejudicial questioning of him when he took the witness stand in his own defense.

Appellant was asked several questions about the whereabouts of his family during the trial, to which he responded by saying they were not present for various reasons. Appellant cites *Caveney v. State,* (1936) 210 Ind. 455, 4 N.E.2d 137, in support of the proposition such questioning implying the accused's own family is not supporting him during his trial and thus believes him to be guilty is improper and requires reversal of the conviction.

In reviewing the record we see the following exchange occurred:

"[Defense counsel]—Let me object to that, Your Honor, and ask for an admonishment.

"[Court]—On what basis?

"[Defense counsel]—On the basis they are not required to be here in this courtroom, if you want them here you could subpoena or call them.

"[State]—What is the basis of the objection?

"[Court]—Let's move along, ask your next question."

█ We do not believe the statements here are sufficiently specific to have placed before the court the legal grounds upon which he was relying in making the objection. Specific grounds for an objection must be stated in order to preserve the issue for appellate review. *Brown v. State,* (1981) Ind., 417 N.E.2d 333. Thus, we see no error committed by the trial court in this regard. We further note the trial judge made no ruling on the objection. Error can only be predicated on questions presented to and ruled upon by the trial court. *Rogers v. State,* (1979) Ind., 396 N.E.2d 348.

In a related claim appellant asserts the trial court erred in overruling his objection and failing to give the jury an admonishment to disregard the following question asked of him by the prosecutor: "Would it be correct to say that you thought of Lennie and her family as Scott County hillbillies?" Appellant claims the questioning was equivalent to the wielding of an "evidentiary harpoon" calculated to prejudice the Scott County jury against him.

We find no merit to the State's first argument appellant has waived any error by failing to make a timely and proper objection. A specific objection was made immediately after the question was asked. The objection, however, was not ruled upon at that time.

Later during the State's cross-examination of appellant the jury was excused for argument on another point. At that time defense counsel referred back to the "hillbilly" question and moved for a mistrial on the basis such remark was reversible error. The record shows the trial court denied the motion for mistrial but sustained the earlier objection. No admonishment to the jury to disregard the question was asked for or given at this point. During redirect examination, appellant denied ever having made any remark about his wife's family being hillbillies and further stated, "I would call myself a hillbilly."

▬ In the case at bar, assuming *arguendo,* the prosecutor committed misconduct in asking the question, we find such conduct likely had no effect on the jury's decision. As noted in *Maldonado v. State,* (1976) 265 Ind. 492, 498, 355 N.E.2d 843, 848, such determination is made in light of all the circumstances. Despite the absence of an admonishment to the jury considering appellant's response upon redirect examination when asked if he ever made such a remark, it seems unlikely the question influenced the jury in reaching its decision. We cannot say the defendant was placed in a position of "grave peril" by the conduct of the prosecutor. *Maldonado, supra.*

Appellant claims the trial court erred in admitting pictures taken at the autopsies performed on the victims. These exhibits consisted of two photographs of the victim's from the neck up. Each shows a single bullet wound above the left eye. Appellant contends these pictures are overly gruesome and serve no purpose other than to inflame the passion of the jury. He also argues the photographs should not have been admitted because other evidence had been admitted as to the cause of death of both of the victims.

▬ We have held photographs, including those taken at autopsies, are admissible when testimony concerning that which they depict could be properly admitted. Such photographs illustrative of a witness' testimony and tending to prove cause of death may be admitted into evidence. *Moore v. State,* (1981) Ind., 414 N.E.2d 558. The fact such photographs may be gruesome does not affect their admissibility if they fit within the rule. *Chambers v. State,* (1979) Ind., 392 N.E.2d 1156.

▬ In the case at bar testimony from the pathologist who performed the autopsies was admitted into evidence. The photographs served to illustrate his testimony and explain the cause of death. There was no error in admitting the photographs into evidence.

Appellant claims the trial court erred in overruling his oral Motion in Limine to prohibit the State from using its rebuttal to "rehash" its case in chief. He also contends the State used rebuttal for precisely that purpose. The record reflects during rebuttal appellant offered numerous objections to questions asked by the prosecutor, some of which were overruled and some of which were sustained.

▬ Rebuttal evidence is limited to that which tends to explain, contradict, or disprove evidence offered by the adverse party. *Norton v. State,* (1980) Ind., 408 N.E.2d 514. The scope of rebuttal is a matter left to the discretion of the trial court and failure to limit its scope is reversible error only for abuse of that discretion. *Id.*

▬ We do not find the court abused its discretion here. The record reflects appellant's objections to questions asked by the prosecutor, premised on the grounds the questions were outside the scope of rebuttal, were all sustained. We fail to see how appellant was prejudiced by the mere asking of the questions with no answers having been given. Moreover, it appears the questions to which the objections were sustained related to relatively minor points of the witness' prior testimony.

Appellant also asserts the "Scott County hillbillies harpoon" was placed before the jury again when during rebuttal the prosecutor asked Lennie Begley, "[H]ad the defendant ever indicated to you his attitude toward you and the Hollan family?" We cannot agree this question, which omitted the "hillbilly" phrase, amounted to a replacement of the harpoon before the jury.

Appellant claims the trial court erred in failing to grant him a new trial, by overruling his Motion to Correct Errors, when he showed the prosecutor had withheld exculpatory evidence from him.

Appellant made a standard discovery request of the State prior to trial. At trial appellant's daughter, Kelly Wells, testified on direct examination by the State she never heard her father threaten her mother and never heard him say he would rather see her dead than with another man. At that time the State did not explore the line of questioning any further. On redirect examination the State referred to a statement she made to police officer Wayne Williams in which she stated she had heard her father threaten her mother in the past. She also admitted she said in the statement she had heard her father say he would just as soon see her mother dead as see her with another man. She was not questioned as to whether the testimony she now gave or the prior statement was the truth. Though the State later attempted to do so, the statement made by Officer Williams was never admitted into evidence.

On May 5, 1981, judgment was entered in this case. A Motion to Correct Errors was filed July 2, 1981. On September 14, 1981, Kelly Wells filed an Affidavit in Support of Motion to Correct Errors. In that affidavit she alleged that prior to testifying at trial she told the prosecutor the statement she made to Officer Williams was false insofar as the threats and comment alluded to above were concerned. Then on September 21, 1981, appellant filed a "Motion for Relief from Judgment and/or to Supplement Motion to Correct Errors," in which he raised the argument now raised on appeal. Essentially this argument is that on the

principles enunciated in *Brady v. Maryland,* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, he was entitled to a new trial because the prosecutor suppressed evidence favorable to him by failing to notify him of Kelly Wells' intent to refute part of her prior testimony.

In *United States v. Agurs,* (1976) 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342, the Supreme Court elaborated on the principle laid down in the *Brady* case. In the case of *Carey v. State,* (1981) Ind., 416 N.E.2d 1252, this Court discussed this particular ruling by the United States Supreme Court. In that case 416 N.E.2d at 1258 this Court stated:

"The rule of *Agurs* presupposes a situation where the omitted evidence is neither disclosed to defense counsel prior to trial nor presented to the jury during trial. *See United States v. Agurs, supra,* 427 U.S. at 102, 96 S.Ct. at 2397, 49 L.Ed.2d at 349; *Brady v. Maryland,* (1963) 373 U.S. 83, 84, 83 S.Ct. 1194, 1195, 10 L.Ed.2d 215, 217; *Sypniewski v. State,* (1980) Ind., 400 N.E.2d 1122, 1123–24. The evidence in question here was, in fact, presented to the jury, and defense counsel had an ample opportunity to cross-examine Shields and Officer Schneider on this matter. Thus, we are not concerned here with evidence which was, in the final analysis, 'suppressed' or 'omitted' from the jury's consideration by the State."

 In the case at bar, the "suppressed evidence" was presented to the jury by virtue of the prosecutor's direct examination of Kelly Wells. In light of that fact we do not see how appellant was denied a fair trial. If indeed he was surprised by her testimony and wanted more time to investigate by interviewing her himself, he could have asked for a continuance. *Hardin v. State,* (1981) Ind., 414 N.E.2d 570. We hold there was no error in denying appellant a new trial due to the failure of the prosecutor to reveal Kelly Wells' intent to refute her prior statement.

Appellant claims the trial court erred in admitting evidence of a prior argument be-

tween appellant and his wife. Lennie Begley testified that she and her sons visited the Wells' home on a day in January, 1980, and an argument between appellant and his wife began while they were there. This culminated in appellant striking his wife in the face with his hands and fists. She further testified that while they all drove back to Austin in appellant's car he continued to "backhand" his wife every time she tried to speak.

There is no error in the admission of this evidence. Evidence of threats or beatings or assaults on the same victim by the accused is admissible in a homicide prosecution as evidence and intent to kill. *Moore v. State,* (1981) Ind., 414 N.E.2d 558; *Martin v. State,* (1978) 267 Ind. 583, 372 N.E.2d 181. The only case cited by appellant in support of this argument is *Greer v. State,* (1969) 252 Ind. 20, 245 N.E.2d 158. This case stands for precisely the rule we have here identified.

The trial court is in all things affirmed.

HUNTER, DeBRULER and PIVARNIK, JJ., concur.

PRENTICE, J., concurs in result with separate opinion.

PRENTICE, Justice, concurring.

I agree that the admission of the evidence of an unrelated shooting incident at International Harvester in Louisville is harmless error in this case.

The foundation for admission of evidence of unrelated crimes requires proof that the accused committed the unrelated crime. *Parker v. State,* (1981) Ind., 425 N.E.2d 628, 633; *Bruce v. State,* (1978) 268 Ind. 180, 246, 375 N.E.2d 1042, 1077, *cert. denied,* (1978) 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662; *Randolph v. State,* (1977) 266 Ind. 179, 181, 361 N.E.2d 900, 901; *Hinkle v. State,* (1980) Ind.App., 405 N.E.2d 556, 558. That proof is lacking here. *Todd v. State,* (1951) 229 Ind. 664, 673, 101 N.E.2d 45, 49 (" 'Evidence of other crimes should appear to be substantial, and at least make out a prima facie case before it is admitted. If the evidence of another crime amounts only to

a suspicion, it should not be received. Underhill, *Criminal Evidence* (4th Ed.), § 182, p. 327.' "). Having correctly recognized this deficiency, the majority incorrectly applies the harmless error rule.

The State certainly did not offer this evidence to encourage the jury to view Defendant as not guilty of the unrelated shooting. Obviously, it wanted the jury to consider this deed, along with evidence of Defendant's other prior bad acts, for the disparaging effect those acts would have upon his alibi testimony. The evidence portrayed Defendant as a man who settled disputes with a gun. Consequently, the testimony that he was not a suspect in the International Harvester shooting would not alleviate the harm done by the improperly admitted prejudicial evidence. The majority's analysis is not relevant for purposes of determining harmless error. When prejudicial evidence is erroneously admitted, we are required to consider *all* the evidence to determine if it may have contributed to the verdict, or conversely, if the State's case is very strong, that the erroneously admitted evidence could not have contributed to the verdict. *Loy v. State,* (1982) Ind., 436 N.E.2d 1125; *Miller v. State,* (1982) Ind., 436 N.E.2d 1113; *Williams v. State,* (1981) Ind., 426 N.E.2d 662, 671; *Mitchell v. State,* (1972) 259 Ind. 418, 287 N.E.2d 860.

In this case I am persuaded that this evidence did not contribute to the verdict. The record contains inculpatory circumstantial evidence, in addition to the extensive evidence related by the majority.

An inference can be drawn from the record that Defendant wanted his automobile safely out of the jurisdiction of the Indiana authorities. Witness David Sheperd testified that Investigation Services, Inc., the firm of which he was President, was employed by Mr. Sales, Defendant's attorney, on April 28, 1980, four days after the Murders. At Sales' request Shepherd, a former Louisville police officer, contacted Indiana authorities to learn whether or not there was a warrant outstanding for Defendant's arrest. He learned that there was none,

but that two detectives did want to talk to him. Shepherd conveyed this information to Sales, who requested that Shepherd go to a truck stop in Dale, Indiana, retrieve Defendant's automobile and bring it to Louisville. Shepherd, accompanied by one Stewart, drove Defendant's vehicle, at 8:00 p.m. that evening to Owensboro, Kentucky, where they stopped for supper, and then proceeded to his firm's parking lot located near Louisville. The car remained there until June, 1980 when the wife of an FBI agent fortuitously copied the license plate number and referred it to her husband.

The record also discloses that Defendant's alibi was not air tight. From all the testimony offered at trial, the murders occurred as early as 9:25 p.m. or as late as 9:35 p.m. More likely than not they happened before 9:30 p.m. because Mrs. Sizemore and her son-in-law, both of whom heard the gun shots, remembered that at that time a television program was "changing", which I understand to mean that the program was going off the air. Moreover, Lennie Begley testified that Defendant and her husband returned to her apartment at "10 or 15" after nine and Defendant stayed, "Maybe 10 minutes, just a few minutes." The brevity of Defendant's visit is corroborated by the testimony of Lennie's son, Larry Hollan:

> "A. Well, mom and dad had a few words and he (Defendant) left and I heard a truck, Bill's truck, and I looked out the window and it wasn't there and then I heard it again opened the door and ran out 'cause I knew he would probably come over to our house and he just kept on goin' and I seen Larry behind him, his car." R. at 344.

The truck was moving at a faster rate of speed than the victim usually drove, and Defendant's vehicle followed just five to six feet behind. The murder scene was approximately three blocks from where Larry Hollan had observed the vehicles.

In support of the defense, a witness testified that it took one hour and sixteen minutes at 65 m.p.h. to travel from the scene in Austin, Indiana to the tavern in Greenwood, where Defendant testified he had gone after leaving the Begley apartment. Another witness stated that the trip took at least an hour. Defendant testified that he checked the time, 10:28 p.m., when he arrived at the tavern, and a police officer in Greenwood observed Defendant pull in to the tavern parking lot at around 10:30 p.m.

Norma Sizemore observed a full size red car with a black vinyl top hurriedly depart from the scene. The automobile made a loud noise as if someone had "stomped" on the accelerator and proceeded "real fast" through the intersection. Thus, if Defendant left the murder scene at 9:25 p.m. in a hurry, he could have reached the tavern in Greenwood by 10:30 p.m. *See White v. State,* (1981) Ind., 425 N.E.2d 95, 97.

Finally, the evidence at the scene suggests that the victims knew their assailant. The victim's truck had no blood on the outside of it before the bodies were removed. It was discovered with the gear shift in "park", the lights on, and the motor still running. The driver's window (left side) was rolled down. Both victims suffered bullet wounds to their left temples. The interval between the gun shots was, at most, two seconds. There was no evidence that suggested a motive of robbery or some other crime.

From the evidence, the jury could easily have inferred that the victims knew Defendant was following them and made some gesture for them to stop, which they did. Since they were acquainted with him, they had no reason to fear for their safety. It is reasonable to believe that at that moment, when Defendant approached the truck, the anger and resentment, which he had expressed toward his wife and her boy friend throughout that day, was completely released and that he "got even," before the victims had realized they were in danger.

I join the majority opinion on the other issues and concur in the affirmance of the conviction.